UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

ROBIN SCHUMACHER,

                Plaintiff,

                          AFFIDAVIT IN RESPONSE TO
                          PLAINTIFF ROBIN
                          SCHUMACHER'S OPPOSITION
                          TO MOTION FOR SUMMARY
                          JUDGMENT

       -against-

                          Index No.05-CV-0753
                          GLS/DRH

NEW YORK STATE OFFICES OF PARKS
RECREATION AND HISTORIC PRESERVATION,
PETER BEAUDRY and CHERYL GOLD, as aiders
and abettors and as necessary parties, NEW YORK
STATE DEPARTMENT OF CIVIL SERVICE and
NEW YORK STATE DEPARTMENT OF AUDIT
AND CONTROL,

                Defendants.
_____

State of New York)
County of Albany ) ss.:

PETER BEAUDRY, being duly sworn deposes and states that:

    1. I am a named defendant in the above captioned matter and I offer this affidavit in response to Plaintiff Robin Schumacker's opposition to defendants' Motion for Summary Judgment.

    2. Schumacher's affidavit dated 2/15/07, the charge of discrimination filed with the New York State Division of Human Rights ("NYSDHR") and the amended complaint filed with this Court are replete with false accusations and inconsistent statements.

    3. In her amended complaint paragraph 17, Schumacher alleges that: "Beginning on or about

1995 and continuing to the present day, Peter Beaudry began a continuous course of sexual harassment. This harassment included pinching, slapping my rear end, touching (buttocks and other personal areas), reaching into my short as well as sexual comments, requests for sexual favors and lewd looks and comments." The amended complaint is dated July 14, 2005.

3. In Schumacher's complaint filed with the NYS Division of Human Rights sworn to on April 10, 2000, paragraph 2., alleges that: "Beginning about five years ago, my immediate supervisor, Peter Beaudry began a continuing campaign of sexual harassment of me by pinching, slapping and touching me on my buttocks and in other inappropriate places, making comments of a sexual nature to me propositioning me and retaliating against me for rejecting his advances and telling him that his conduct was unwelcome and should stop…"

4. In Schumacher's affidavit dated 2/15/07, paragraph 7 she states in part that: "**From the beginning of my employment** Beaudry would make sexist comments, touch me on the rear back and legs, make comments about my body, take things out of my back pocket, slap me on the rear end and in general make me very uncomfortable." At no time, whether from the beginning of her employment or since 1995 to the present, did I sexually harass Schumacher.

5. The Saratoga Park ("Park") employees dozens of workers (approximately 18-22 under my supervision) and is visited during the year by thousands people. There are also numerous contractors who perform various services at the park. The Park also utilizes inmate labor from the NYS Department of Corrections. The Park is a vibrant and energetic facility that is home to a variety of daily events. Schumacher sign shop is in the maintenance building and is frequented by numerous maintenance staff during the course of every workday.

6. It is undisputed that I supervised the Park Sign Shop and Schumacher. As previously stated Schumacher's production of signs and related material was always satisfactory. The issues

that developed between Schumacher and myself primarily involved maintaining her work area. As her supervisor I was responsible for ensuring that work was completed. I was also responsible for ensuring that all Park facilities and work areas were maintained in a safe and orderly manner. Schumacher's work area also contained flammable solvents on other flammable materials and was subject to safety inspections. On one occasion I was informed that as a result of a fire inspection that if her work area was not cleaned that area would be shut down and locked off. I consistently addressed issues of cleanliness and neatness with Schumacher. I included references to maintaining her work area in her performance evaluations and spoke to her about maintaining her area. I believe that during my approximately 12 years of supervising Schumacher, in addition to my references to her unkempt work area in her evaluations I may have written two counseling memorandums to her. Issues of cleanliness and dress applied to all Park workers. I did not single Schumacher for special treatment. I wanted Schumacher to maintain her area in a safe and orderly fashion. Although I consistently gave her a satisfactory performance rating I regularly addressed the cleanliness of her work area. I offered her additional help when needed, additional shelving and told her to take what ever time is necessary during each day to clean her area. A secondary issue was her dress that from time to time was inappropriate for work.

      7. In November 1999 after becoming aware of the upgrade of my position from a Grade 14 to a Grade 17, Schumacher formally alleged that I sexual harassed her with words, actions and physical touching. She now claims a long history of abuse however it is undisputed that up until August 6, 1999 (the isolated event in which I admitted that I touched her sternum) she never complained to me or a supervisor that my conduct was inappropriate or that I sexually harassed her. No co-worker, supervisor, union representative, law enforcer ever came to me or otherwise communicated that I had offended Schumacher by my conduct. As a result of Schumacher's

allegations I have been subjected to ridicule and humiliation. I find myself having to prove a negative. Schumacher's allegations went unreported and are unwitnessed. The employee statements Plaintiff's Exhibit 3, are hearsay, unsworn statements from employees previously under my supervision who harbor animus toward me.

    8. Schumacher was fully aware of complaint procedures pertaining to harassment in the workplace and her efforts to claim ignorance are not credible. Schumacher's Affidavit, paragraph 8, refers to a complaint filed by Schumacher against Jeff McGreevy. Schumacher states that, "In 1998 there was an incident outside of work with Jeff McGreevy and Pete Beaudry." I was not involved in this incident. It is undisputed that I was not at the bar where Schumacher alleges McGreevy touched her breast. See Schumacher Affidavit, paragraph 8, and Plaintiff's Exhibit 1. Despite my lack of involvement in the McGreavy matter Schumacher falsely accuses me of being involved. I was not involved, not present and did not make any derogatory statement to Schumacher regarding her complaint against McGreevy.

    9. Schumacher's, Plaintiff's Exhibit 1., indicates that she was fully aware of the employer's complaint processes. If she believed that she was maltreated or sexually harassed she understood that she could complain directly to OPRHP Affirmative Action and an investigation would be conducted and action taken. Plaintiff Schumacher would have this Court believe she had no knowledge of complaint processes or procedures. The fact that she fully engaged in the complaint process in 1989 and participated in an investigation is evidence of her knowledge.

    10. It in 1989, Schumacher complained of sexual harassment, discrimination and retaliation. Plaintiff's Exhibit 1. She alleged that McGreavy touched her breast and that she was subsequently retaliated against with issues of proper dress and the cleanliness of her work area. McGreavy apparently denied any physical contact with Schumacher. Despite her 1989 complaint against

McGreavy, Schumacher continued to associate with McGreavy. After the 1989 complaint she did not complain to me about McGreavy or requested that he not associate with her.

11. Schumacher alleges that I had the authority to terminate her employment. As a permanent employee Schumacher is represented by CSEA. I was also a member of CSEA. In order to terminate a permanent employee OPRHP management, well above my pay grade, would determine whether to pursue disciplinary charges against an employee. The disciplinary process is also governed by the collective bargaining agreement. I have never had the authority to terminate an employee whether probationary or permanent. I never stated to Schumacher that I could get her fired. Schumacher's allegations are refuted by the fact that I consistently gave her a "satisfactory" rating on her performance evaluations. Any counseling whether written or oral regarding her work area or dress were relatively few. Counseling memoranda is not a form of discipline but a means of communicating with the employee.

12. I did not control longevity pay increments which were governed by the collective bargaining agreement ("CBA") and based on number of years of service. I did not control promotions. Promotions were governed by NYS Civil Service Law. Schumacher sign painter position was the only sign painter position at the Park. I have no knowledge of Schumacher seeking employment in any other capacity. Like all other NYS employees she could apply for positions throughout NYS. If she believed she was working out of title she could file a grievance.

13. Schumacher alleges that I had the authority or ability to make employees lives miserable by giving people "crap" jobs. I did not have either the authority or ability to manipulate job assignments. Job assignments were governed by Park requirements, Civil Service job titles, and CBA. It should be clear that I had no ability or authority to assign the sign painter to anything other than sign painting. I also had no authority to directly promote anyone, which again was subject to

Civil Service.

14. There was no automatic overtime as it depended on the needs of the Park and budgetary constraints. If a project needed to be completed and was time critical overtime was appropriate. At times there were plumbing or similar emergencies would require that the job be completed and therefore overtime was appropriate. Certain Park functions also provided employees with overtime opportunities and in these instances overtime was subject to CSEA agreement and was rotated between all employees who wanted overtime. If Schumacher required overtime in order to complete a time sensitive project it was granted. I do not know whether Schumacher place her name on the overtime list for other Park overtime activities. Overtime usage was also subject to review by upper management because of budgetary constraints. I have no knowledge as to whether overtime hours cited by Schumacher are accurate or the circumstances in which Mr. Kuhn approves additional overtime. Whatever overtime was worked by Schumacher during my tenure was governed by the needs of the Park and Schumacher's desire to work overtime on the rotational basis. Schumacher never complained formally or informally about overtime. Schumacher could have filed a grievance regarding overtime if she believed she was not properly considered.

15. Schumacher alleges that she was denied the snow plowing. A list of employees called upon for plowing was established prior to my assignment at the Park and was based on licensing, if required, and plowing experience. As employees retired or no longer wanted to plow they would be replaced by employees who had the necessary licensing and past plowing experience. I never said to Schumacher that if she "put out" I would put her on the plow list. I have no knowledge of Schumacher complained formally or informally about the plow list.

16. Schumacher's leave requests were always considered, processed and leave granted in accordance with OPRHP procedures. As a supervisor I believe I was lenient regarding matters of

time and attendance. I was lenient regarding notification for taking leave but of course the more notice from an employee the better. Cheryl Gold management style was different than mine. Gold has requirements for reporting, leave and related matters. She requires various writing reports and documentation of all those who work directly for her. As a manager directly reporting to Gold I complied with her directives.

16. Schumacher did not complain to me and I have no knowledge of any complaint by Schumacher regarding language in the workplace, calendars, or pencil holders that are now of issue. I do know that any calendars or office material that may in any way potentially offend is not to be displayed and management took steps to remove. I do have knowledge of Schumacher's use of vulgarity and swearing in the workplace. No worker complained regarding her use of vulgarity and swearing. See also Schumacher Affidavit page 127-131, in which Schumacher states that she has "spats" with McGreavy two or three times per year and would call McGreavy "ass", "jerk", "touchhole" and McGreavy would call her a bitch. Although I was aware that Schumacher use vulgar language she did complain about McGreavy's conduct or alleged spats.

17. In regards to sexual harassment training, Dean Turner, then Affirmative Action Director gave the training. The training was regularly given to all park employees including Schumacher. Sexual harassment procedures are also set out in the employee's handbook given to all park employees including Schumacher. There were various posters up at the Park indicating what an employee could do if she believed she was sexually harassed. Again it is clear from the 1989 McGreavy event that Schumacher was aware that she could go directly to management, complain to Affirmative Action and seek counsel from the union.

18. Contrary to Schumacher's allegations I did not engage in a course of conduct depriving Schumacher of her civil rights. I did not sexually harass her. The August 5, 1999 event was an

isolated incident when I touch her sternum indicating her dress was not appropriate. Schumacher complained to Cheryl Gold in accordance with one of the procedural mechanisms. She told Gold that she was offended when I touched her. I apologized and assured her that it would not happen again. Only after the November 1999 upgrade of my position am I then accused of a long history of alleged abuse. Prior to August 5, 1999, Schumacher did not state to me or in any way communicate that she found my conduct offensive. Once it was communicated to me that Schumacher was offended by my conduct of August 5, 1999 I apologized. Although no other employee was present, it was not by intention to demean or humiliate Schumacher. After reflecting on the events of August 5, 1999 I realized that my touching her sternum to make my point about appropriate dress was not appropriate and would not happen again. I believed the matter to be closed.

19. In or about November 1999, I was informed that my application for a Civil Service upgrade of my position was approved by the NYS Department of Civil Service. I had previously filed a contract grievance alleging that I was working "out of tile" because of my assigned duties and responsibilities. The NYS Governor's Office of Employee Relations ("GOER") determined that I was working out of title and directed that I receive back pay. In or about December 1999 I became a Grade 17. My duties and responsibilities did not change as a result of the upgrade of my position.

20. Throughout my work life I have been engaged in various aspect of construction. I have worked my entire career with all trades people to include carpenters, plumbers, electricians, masons, roofers, etc. I have significant hands on experience with all aspects of construction and trade work. I was fully qualified to perform the upgraded position to which I was appointed.

21. I have not engaged in a pattern or practice of sexual harassment with Schumacher or any employee of OPRHP. I have never been convicted of any crime, never mind a violent crime. I have never threatened Schumacher or made derogatory remarks pertaining to her or her charge of

discrimination. I have not taken any steps to retaliate against Schumacher. I did not tell any one not to speak with Schumacher. In fact I did not speak to anyone regarding Schumacher's complaint or allegations because it was both embarrassing, humiliating and the subject of an investigation.

22. In regards to Schumacher's request for upgrade I was not involved in this process and was not aware she had made application for an upgrade. Schumacher did not inform me of the fact she had requested an upgrade of her position or requested my assistance in anyway. As I previously stated, I submitted an out of title work grievance, which ultimately resulted in an award of back pay and an upgrade of my position. Once appointed to the Grade 17 position I served a probationary period. My probationary employment was extended, I suspect because of the Schumacher complaint but ultimately I successfully completed the probation. If I had not filed the out of title grievance I am confident that I would not have been upgraded and I would have continue as a Grade 14. It is my understanding that Schumacher did not file a contract grievance alleging working out of tile and has not file a grievance to date. As former union president she is certainly aware of the grievance process.

23. I did not discuss Schumacher's complaint of harassment with any co-workers and made no threats. I did not ostracize Schumacher or in anyway encourage others to ostracize her.  In January 2000 I did not yell and swear at Schumacher. After being informed that Schumacher was making a formal complaint of harassment I did ask her why she was making a formal complaint believing the matter was resolved back in August 1999. Schumacher response to me was that it was out her hands.

24. My touching of Schumacher on August 5, 1999 was an isolated incident. I did not touch her breast or cleavage. I believed the matter was resolved with my apology and my assurance that I would not touch Schumacher. On August 5, 1999, Schumacher did not accuse me of any other

offensive, language or retaliation. I did not aid or abet anyone to violate Schumacher's rights under NYS Human Rights Law §296.  I deny the allegations of sexual harassment and violations of NYS and Federal Law.

    Wherefore I request that this Motion for Summary Judgment be granted.

Dated: March 28, 2007

             /s/PETER BEAUDRY

Sworn this 28 day March 2007
/s/Joseph P. McGovern
Notary 4969082 Exp. July 9, 2010